**BEAN DREDGING CORPORATION and Weeks Marine, Inc., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 604–89C.**

United States Claims Court.

Feb. 14, 1990.

Peter M. Kilcullen, Washington, D.C., atty. of record, for plaintiffs.

Shalom Brilliant, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This is a pre-award bid protest case seeking injunctive relief under 28 U.S.C. § 1491(a)(3) (West Supp.1989).[1] Plaintiffs Bean Dredging Corporation and Weeks Marine, Inc. (hereinafter Bean, Weeks, or plaintiffs) are joint venturers who seek to enjoin the United States Army Corps of Engineers (Corps or defendant) from cancelling an invitation for bids, which contemplates the performance of maintenance

---

1. Jurisdiction is premised on 28 U.S.C. § 1491(a)(3), which provides as follows:

   To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. . . .

dredging[2] on the Mobile River in Mobile, Alabama. The Corps has proposed to cancel the invitation pursuant to the authority of 33 U.S.C. § 624 (West Supp.1989), which prohibits the award of river and harbor improvement contracts when every bid received by the Corps is *more than* 25% higher than the government's estimate for performance of that same work. Plaintiffs, the lowest responsive and responsible bidders on subject project, challenge the defendant's authority to cancel the invitation. Specifically, they contend that the Corps did not prepare a fair and reasonable cost estimate of a well-equipped contractor doing the work, as required by 33 U.S.C. § 624 and applicable regulations. Moreover, plaintiffs aver that this failure constitutes a violation of the implied-in-fact contractual obligation requiring the defendant to consider and treat all bids fairly.

Plaintiffs' motion for a temporary restraining order was denied as moot. Their motions for preliminary and permanent injunctive relief were thereafter consolidated, and a hearing was held on the merits for a permanent injunction from November 29, 1989 to December 5, 1989. For the reasons stated hereinafter, we grant plaintiffs' consolidated motion for injunctive relief.

*Facts*

The Corps' Mobile District Office issued Invitation for Bids (IFB) No. DACW01–89–B–0076 on July 27, 1989. The IFB solicited bids for maintenance dredging on the Mobile River ship channel in Mobile, Alabama. The work was to be performed on that portion of the river between Station 0 + 00 − tangent 1 and Station 31 + 60 − tangent 5; a dredging channel of approximately 24,000 to 25,000 feet in length and 500 to 1,000 feet in width. The IFB required "the removal ... of the material lying above the channel bottom elevations (below mean low water) and over the channel bottom widths and lengths as specified on the contract

drawings," PX 3, p. 2A–1. This requirement contemplated the removal of all shoal[3] material within a box-cut prism. Thus, offerors were required to bid the project according to the materials within the prism, described as a depth of −42.0 feet below mean low water and the channel width prescribed by contract drawings referenced in the IFB. The quantity of materials to be removed was not advertised by the Corps. Bidders were, therefore, required to make this determination for themselves on the basis of IFB drawings coupled with three channel surveys included with the IFB. These three surveys, taken in November 1988, May 1989, and August 1989, provided all bidders with various channel cross-sections which indicated the distribution of the shoal material to be removed from the box-cut template.

The materials dredged were to be deposited in two disposal areas. The quantity of the materials to be placed in the first disposal area, known as Mud Lakes 6/7, was restricted to 1,000,000 gross cubic yards. The remainder of the dredged materials was to be deposited in the second disposal area, known as Gaillard Island, which was approximately 14 miles beyond the midpoint of the Mobile River work site. The fact of the foregoing distance to Gaillard Island as a disposal site necessarily contemplated the use of dredging pipeline with an average length of 72,000 feet. This requirement unquestionably made the project unconventional in that it required substantial amounts of submersible pipeline. This is so for the additional fact that the pipeline length was more than the Corps had used on any of five previous contracts in the Mobile River, PX 8.

Under the terms of the IFB, bidders were required to submit fixed, lump-sum prices for four line bid items. The four required components of each bid included:

---

**2.** Maintenance dredging is the process by which materials that have accumulated in a previously dredged channel are removed to maintain the desired channel width and depth. This is to be distinguished from original dredging, which is the process of creating a new channel through the removal of virgin materials.

**3.** The shoal is that material deposited in the channel over time. In this case, it is comprised primarily of mud and silt traveling down the Mobile River, and deposited in Mobile Bay. It also includes any material deposited in the channel as a result of tidewater effects.

*Bid Item*

    # 1—Mobilization and Demobilization;

    # 2—Mobile River Dredging;

    # 3—Dike Construction and General Rehabilitation for both the Mud Lakes 6/7 and Gaillard Island Disposal Areas; and

    # 4—Operation and Maintenance Costs Associated with the Mud Lakes 6/7 and Gaillard Island Disposal Areas.

The Corps, as required, prepared a project contract estimate by which it sought to judge all bids received pursuant to the solicitation. That estimate was prepared by Mr. Paul Warren, Area Engineer for the Mobile District. As Area Engineer, Mr. Warren is responsible for monitoring the condition of federal navigational channels in the Mobile District, drafting contract specifications for dredging projects, estimating the cost of dredging projects in the District, and execution of those projects. Mr. Warren, a civil engineer registered in the State of Alabama and employed with the Corps since 1974, estimated the cost of the project in issue on four separate occasions. *See* Appendix E. Each such estimate was prepared on a cost basis, without reference to profit. Additionally, the first two estimates, prepared prior to this litigation, were noted approved by Mr. James R. Couey, Engineering Division Chief. Said estimates were as follows: [4]

|  | The Corps' Estimates | | | |
|---|---|---|---|---|
| Item | Original Estimate | Revised Before Trial | Revised at Trial | Best & Final |
| 1 Mob & Demob | $ 437,698 | $3,222,625 | $3,426,031 | $3,424,945 |
| 2 Dredging Mobile River | 5,392,002 | 4,256,841 | 4,256,841 | 4,267,006 |
| 3 D/A Activities Dike | 84,036 | 84,036 | 84,036 | 84,036 |
| 4 D/A Activities Operations | 146,760 | 146,760 | 146,760 | 146,760 |
|  | $6,060,496 | $7,710,262 | $7,913,668 | $7,922,747. |

The Best and Final Estimate (B & FE), DX 7, was increased by the Corps over the Original Estimate by the amount of $1,862,-252 ($7,922,747 — $6,060,495) or by 30.72%. The circumstances regarding the preparation of each are discussed seriatim, along with its impact on the award process.

Plaintiffs, a joint venture in which Weeks was to provide the financial assistance and Bean was to furnish the labor and equipment, submitted an $11,246,000 fixed lump-sum bid on the Mobile River dredging project. It estimated that the following costs would be incurred for each of the four bid items:

| Item | Amount |
|---|---|
| (1) Mobilization/Demobilization | $3,700,000 |
| (2) Dredging Mobile River | 7,416,000 |

| Item | Amount |
|---|---|
| (3) D/A Dike Construction | 100,000 |
| (4) D/A Operation and Maintenance | 30,000 |
| Total Bid | $11,246,000. |

Their bid was prepared by Mr. Ancil Taylor, the holder of a bachelor of science degree in construction engineering and plaintiff Bean's Manager of Engineering and Estimating. Mr. Taylor has been employed in this capacity for 10 years and is responsible for bidding, analyzing equipment production capabilities, and implementing any dredging methods that would enhance productivity. Mr. Taylor is *not*, however, a licensed engineer, nor is there evidence of any graduate degrees or study in the engineering field.

**4.** The "Original Estimate" was for $6,060,496.01 and is contained in PX 7, p. 1. It was later superseded by a "Revised Estimate," PX 7, p. 21, in the amount of $7,710,262.06. The "Revised Estimate," by correcting an error in addition for mobilization and demobilization, was modified at trial to $7,913,668. Tr. 480–481. Finally, Mr. Warren prepared a "Best and Final" Estimate in the amount of $7,922,747.17, DX 7, which was not introduced until the third day of trial. Through all of these revisions, only bid items # 1 and # 2 were modified. Each of the four government estimates are set forth *in detail,* on Appendix E.

The Corps opened bids on September 28, 1989, and received four responsive offers. All were judged and compared with the $6,060,496.01 Original Estimate, the only Corps' estimate in existence at that time. It was concluded by the Corps that the lowest bid had been submitted by plaintiffs.[5] However, citing 33 U.S.C. § 624, *see* note 14, *infra,* which prohibits the award of river and harbor improvement contracts when all bids exceed the government's estimate by *more than 25%,* the Corps refused to award the contract. More specifically, plaintiffs' $11,246,00 bid was far more than 25% greater than the $6,060,496.01 the Corps estimated would be required to accomplish the work. Under its $6,060,496.01 Original Estimate, assuming, of course, it complied with 33 U.S.C. § 624, the Corps could not have made an award on any bid higher than $7,575,620.[6]

Bean, on behalf of the joint venture, protested the reasonableness of the government's estimate by a fax transmittal to the Corps on September 29, 1989, PX 5. Said protest requested a review of the Corps' Original Estimate prior to any further action by the Corps, which was done. As a consequence, the Corps made a reconsideration of its estimate, by making some minor changes which did not significantly alter the estimate sufficiently to create an awardable bid, PX 7, p. 40. Subsequently, the Corps informed plaintiffs by telephone that it intended to deny the protest, but offered to further consider any submissions that might influence the contracting officer's decision. In response, plaintiffs submitted an extensive written analysis of the project costs which they deemed to be fair and reasonable, dated October 10,

1989. They attempted to substantiate the alleged reasonableness of their $11,246,000 bid and also sought to demonstrate deficiencies in the government estimate, PX 6. This submission led to a meeting on October 11, 1989, in which Bean, again on behalf of the joint venture, was allowed to make a verbal presentation of plaintiffs' case, PX 6. The Corps analyzed plaintiffs' submission as supplemented and determined that some changes were appropriate. It (the Corps) thereafter prepared a Revised Estimate of $7,710,262, PX 7, p. 21.

The Revised Estimate, while not creating an awardable contract,[7] led the Corps to conclude that a negotiated procurement was possible. Consequently, the Corps decided to convert the IFB to a request for proposals (RFP) to enable the Corps to negotiate with any and all of the original four bidders to produce an awardable contract. When informed of this decision, plaintiffs requested another audience with the Corps. Two meetings were held on October 20, 1989, in which plaintiffs' vigorously contested the Corps' plan to cancel the IFB, PX 7, p. 41. Plaintiffs and the Corps were unable to reach an agreement, whereupon plaintiffs filed suit in this court to enjoin cancellation of the IFB on November 7, 1989. Said suit contends that plaintiffs' bid was not treated fairly, as required, in that the Corps' estimate was determined in violation of 33 U.S.C. § 624.

At trial, and in their efforts to establish that the Corps' estimate was not determined in a fair and reasonable manner, plaintiffs relied exclusively upon the testimony of their estimator, Mr. Taylor.[8] The Corps relied almost entirely upon the testimony of its estimator, Mr. Warren.[9] Upon

---

5. The other bids were as follows: $11,365,000 by T.L. James and Co.; $12,000,000 by Great Lakes, Inc.; and $18,000,000 by Mike Hooks, PX 4.

6. An awardable bid equals no more than the government's fair and reasonable estimate multiplied by 1.25 (awardable bid = government estimate × 1.25). Thus, $7,575,620 = $6,060,496 × 1.25, *see* 33 U.S.C. § 624.

7. Notwithstanding the revised estimate, the Corps could not have made an award on any bid higher than $9,637,828 ($7,710,262 Corps' Revised Estimate × 1.25).

8. Although Mr. Taylor gave a plethora of opinion testimony at trial, surprisingly, he was never qualified as an expert witness by plaintiffs' counsel. Moreover, the record contains no objections to such testimony by defendant.

9. The Corps also introduced the testimony of Mr. Wendell Mears, a project engineer responsible for the preparation of certain cost data contained in the government estimate, and Mr. James Baxter, Mobile District Chief of Navigation, responsible for management of all navigation programs and projects in the Mobile District.

direct examination, Mr. Warren conceded that the Corps' Revised Estimate, PX 7, p. 21, contained mathematical errors. Consequently, Mr. Warren corrected the Revised Estimate at trial from $7,710,262 to $7,913,668.06—an increase of $203,406.[10] On the third day of trial, the Corps introduced its $7,922,747 B & FE, DX 7, through Mr. Warren, on direct examination. That B & FE, apparently, was prepared over a three-day break in trial after plaintiffs had presented all of their evidence. The B & FE, DX 7, superseded the Corps' corrected Revised Estimate, and totalled $7,922,747.17.[11] Notwithstanding this submission, the Corps' B & FE did not produce a § 624 awardable contract.[12] Given the fact that the Corps has modified its $6,060,496.01 Original Estimate, PX 7, p. 1, three times with a Revised Estimate of $7,710,262.00, PX 7, p. 21, a Revised Estimate corrected at trial of $7,913,688.06, Tr. 480–481, and the B & FE of $7,922,747.17, DX 7, the effect of the foregoing is a judicial admission by the Corps that its *original Estimate* was unfair and unreasonable at the very minimum by $1,862,251.16 ($7,922,747.17 − $6,060,496.01). To establish an awardable contract, plaintiffs now are required *to prove only that* the admitted $7,922,747.17 B & FE should have been at least $8,996,800.00, or an increase of $1,074,052.83 ($11,246,000 divided by 1.25 = $8,996,800 − $7,922,747.17). Plaintiffs have, notwithstanding the Corps' B & FE, vigorously renewed their objections to the manner by which the B & FE was prepared, particularly with respect to the estimation of those costs in bid items # 1 and # 2.

10. Bid item # 1 was revised upward from $3,222,625.00 to $3,426,031.00 due to an error in addition. Bid items # 2, # 3, and # 4 remained unchanged. Tr. 481–482.

11. Item # 1 was revised from $3,426,031.00 to $3,424,945.42, and item # 2 was revised upward from $4,256,841 to $4,267,005.75. Items # 3 and # 4 remained unchanged.

12. As a consequence of the Best and Final Estimate prepared by the Corps, no award could be made on any bid higher than $9,903,434. This

*Contentions*

A. Plaintiffs

Alleging that the proof demonstrates entitlement to injunctive relief as a matter of law, plaintiffs aver that the court should, therefore, enjoin any cancellation of the subject IFB on three grounds. First, plaintiffs contend that the Corps violated Federal Acquisition Regulation (FAR) § 14.404–1, codified at 48 C.F.R. § 14.404–1 (1988). That section requires the contract to be awarded to the lowest responsible bidder in the absence of a compelling reason for bid rejection and cancellation of the invitation.[13] According to plaintiffs, the Corps has failed to demonstrate compelling circumstances sufficient to justify the proposed cancellation. Plaintiffs vigorously contend that the evidence produced at trial demonstrates that bid items # 1 and # 2 of the government's estimate are unreasonably low as a result of erroneous and incorrect assumptions, miscalculations, and mathematical errors. These flaws allegedly prevent the Corps from arguing that plaintiffs' estimate was itself unreasonable as a basis for rejecting all bids pursuant to 48 C.F.R. § 14.404–1(c)(6) (1988). That section provides for rejection and cancellation after bid opening when the agency determines that "all otherwise acceptable bids are at unreasonable prices." Plaintiffs contend that the Corps has grossly underestimated the cost of the project in an attempt to depress prices in a subsequent negotiated procurement, which is *not* a compelling reason to permit the Corps to cancel the IFB under FAR § 14.404–1.

Secondly, plaintiffs argue that the Corps has failed to develop a "fair and reasonable" estimate of the costs associated with

figure is the 25% limit on any bid greater than the government estimate. In other words, $9,903,434 = $7,922,747.17 × 1.25.

13. FAR § 14.404–1(a)(1) (1988) states in part:
Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, *award must be made* to that responsible bidder who submitted the lowest responsive bid, *unless there is a compelling reason to reject* all bids and cancel the invitation.
(emphasis added).

performing the Mobile River dredging project, as required by 33 U.S.C. § 624 (West Supp.1989).[14] In support of this assertion, plaintiffs allege that the Corps failed to comply with regulations promulgated under the authority of § 624. More specifically, plaintiffs contend that the Corps did not prepare the estimate for the subject project in accordance with Engineering Regulation (ER) 1110-2-1300, which provides "the estimator with general data, procedures, average values, and a format for guidance in preparing government estimates ... for dredging." Moreover, plaintiffs assert that the Corps did not comply with Engineering Pamphlet (EP) 1110-1-8, which establishes "predetermined equipment ownership and operating expense rates for use in preparation of estimates ...," PX 13, p. 1. According to plaintiffs, the proper application of ER 1110-2-1300, and EP 1110-1-8 as referenced in that regulation, will result in the determination of a fair and reasonable estimate of $16,206,424.[15] This estimate, argue plaintiffs, demonstrates that none of the Corps' estimates were fair and reasonable, and that their estimate of $11,246,000, being well within the parameters of § 624, ER 1110-2-1300, and EP 1110-1-8, is in fact and in law a fair and reasonable estimate.

Thirdly, citing *CACI Field Services, Inc. v. United States,* 13 Cl.Ct. 718 (1987), and *Sterlingwear of Boston, Inc. v. United States,* 11 Cl.Ct. 517 (1987), plaintiffs argue that the Corps has breached the implied-in-fact contract provision contained in all government solicitations to consider bids in a fair and reasonable manner. Thus, goes the argument, the unreasonableness of the government estimate prevented the Corps from giving plaintiffs' bid full and fair consideration. Moreover, say plaintiffs, the Corps' alleged failure to prepare its estimate in accordance with applicable law constituted a *per se* breach of the implied contract when the Corps refused to award the contract.

In sum then, plaintiffs argue that a fair and reasonable estimate prepared in conformity with 33 U.S.C. § 624, ER 1110-2-1300, and EP 1110-1-8 would total $16,-206,424.45. The fact that the Corps did not follow the applicable law, and the further fact that the defendant's B & FE was less than one-half that amount, demonstrates, say plaintiffs, the unreasonableness of its estimate. More importantly, argue plaintiffs, it also demonstrates that their bid was within the awardable range. Consequently, plaintiffs seek to enjoin the proposed cancellation and resolicitation of the IFB here in issue.

B. Defendant

The Corps adamantly contends that its B & FE, DX 7, was indeed fair and reasonable. As such, the Corps argues that it is not only justified in rejecting all bids re-

---

**14.** 33 U.S.C. § 624 (West Supp.1989) sets limits on improvement work by private contract. It states, in part:

(a) Determinations respecting comparison of private contract price with estimation of cost of performance of work by Government plant or by well-equipped contractor

No works of river and harbor improvement shall be done by private contract—

\* \* \* \* \* \*

(2) in any other circumstance where the Secretary of the Army, acting through the Chief of Engineers, determines that the contract price is more than 25 per centum in excess of what he determines to be a fair and reasonable estimated cost of a well-equipped contractor doing the work.

\* \* \* \* \* \*

(c) Considerations involved in determinations of estimation of cost of performance of work by well-equipped contractor

In determining a fair and reasonable estimated cost of doing work by private contract under subsection (a)(2) of this section, the Secretary of the Army, acting through the Chief of Engineers, shall, in addition to the cost of labor and materials, take into account proper charges for depreciation of plant, all expenses for supervision, overhead, workmen's compensation, general liability insurance, taxes (State and local), interest on capital invested in plant, and such other expenses and charges the Secretary of the Army, acting through the Chief of Engineers, determines to be appropriate.

**15.** The basis for this figure was developed in plaintiffs' Proposed Findings of Fact and the schedules attached thereto. Certain relevant portions of the underlying calculations are discussed, *infra.*

ceived for this project and cancelling the IFB, but it is in fact and in law required to do so by 33 U.S.C. § 624. The Corps asserts that its estimate was calculated in full conformity with that statute, along with any and all mandatory regulatory requirements promulgated to implement the statute.

In support of its position, the Corps emphasizes the standard of review and the burden of proof. It vigorously contends that plaintiffs have failed to prove, by what the Corps views as the required quantum of clear and convincing evidence, either that the Corps' decision to cancel the IFB lacked a rational basis, or that its decision was a clear and prejudicial violation of applicable statutes and regulations. In this context, the Corps argues that plaintiffs have not satisfied their burden of proof by clear and convincing evidence that a fair and reasonable estimate for the dredging project at issue should have been at least $8,996,800. That amount is the minimum estimate the Corps must make to produce an awardable contract under the 25% limitation of 33 U.S.C. § 624, in view of plaintiffs' $11,246,000 bid.

The Corps also dismisses as irrelevant the evidence introduced at trial by plaintiffs. That evidence allegedly showed that the Corps did not follow *mandatory* estimating regulations, which, if applied, would supposedly produce a fair and reasonable estimate far in excess of the estimate actually prepared by the Corps. The Corps disputes these assertions, and argues that it complied with all mandatory regulations. According to the Corps, the evidence proffered by plaintiffs demonstrates *only* that a higher estimate *could* be developed. In the Corps' view, the fact that it is possible to develop alternative estimates does not prove that the government estimate was unfair or unreasonable, even if it is assumed, *arguendo*, that the government estimate was low. Thus, asserting that plaintiffs have not satisfied the prerequisites for injunctive relief, the Corps maintains its right to cancel the IFB pursuant to 33 U.S.C. § 624 and resolicit the proposed work.

*Standard of Review*

An examination of the relevant case law reveals that the equitable jurisdiction of this court under 28 U.S.C. § 1491(a)(3) is subject to substantial limitations. In this context, we recently stated that:

> Injunctive relief is extremely drastic; the court must exercise great caution and should not substitute its judgment for that of the agency; judicial intrusion into the procurement pre-award agency decision is generally limited in scope, circumspect, and infrequent; and the court should intervene only when it is clearly determined and proven that the agency's determination is irrational or unreasonable or where the decision was made in clear and prejudicial violation of applicable statutes or regulations....

*TRW Environmental Safety Systems, Inc. v. United States*, 18 Cl.Ct. 33, 42–43 (1989), *citing DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 201–02 (1983). *See CACI Field Services*, 13 Cl.Ct. 725–26; *Baird Corporation v. United States*, 1 Cl.Ct. 662, 664 (1983).

Thus, it is clear that a disappointed bidder may obtain injunctive relief for an alleged agency breach of the implied-in-fact contract obligation to treat each and every bid in a full, fair, and honest manner in one of two ways. The bidder must show either (1) that the agency's decisionmaking process lacked a rational or reasonable basis, or (2) that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *RAD-VA Corporation v. United States*, 17 Cl.Ct. 812, 818–19 (1989). Moreover, proof in either of these two circumstances *must* be established by *clear and convincing evidence. See, e.g., TRW*, 18 Cl.Ct. at 43; *RADVA*, 17 Cl.Ct. at 818; *CACI Field Services*, 13 Cl.Ct. at 725–26; *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 393 (1984); *DeMat Air*, 2 Cl.Ct. at 202. This we have said is an onerous burden, *TRW*, 18 Cl.Ct. at 43, proof of which must, of course, overcome the strong presumption that government officials will perform their official duties properly and in good faith. *Data Transformation Corp. v.*

*United States,* 13 Cl.Ct. 165, 176 (1987); *Gregory Lumber Co. v. United States,* 11 Cl.Ct. 489, 501 (1986), *aff'd,* 831 F.2d 305, *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982, *rehearing denied,* 485 U.S. 1015, 108 S.Ct. 1490, 99 L.Ed.2d 717. The level of proof required to overcome this presumption has been described as "well-nigh irrefragable," a burden which cannot be sustained by speculation. *See, e.g., Gregory Lumber,* 11 Cl.Ct. at 501.

Allegations of irrational or unreasonable decisionmaking by the agency are judged against what amounts to arbitrary and capricious conduct. *TRW,* 18 Cl.Ct. at 43, *citing Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 763 (1985). Allegations of clear and prejudicial statutory and/or regulatory violations, on the other hand, must be supported by the requisite clear and convincing evidence showing that the violation breached the implied-in-fact contract of full and impartial consideration. *CACI Field Services,* 13 Cl.Ct. at 726.

*Issue*

In this dispute, plaintiffs aver that they are entitled to permanent injunctive relief against the Corps for alleged violations of 33 U.S.C. § 624, 48 C.F.R. § 14.404–1, and the implied contract of fair consideration. However, the implied contract of full, fair, and honest consideration is the sole basis for jurisdiction in pre-award bid protest cases. A violation of applicable statutes or regulations is but one of two methods to prove that the implied-in-fact contract has been breached.[16] Thus, notwithstanding the manner by which plaintiffs have framed this dispute, we see *the sole issue* requiring resolution here to be—whether the Corps prepared a fair and reasonable estimate of the costs likely to be incurred by a well-equipped private contractor on the Mobile River dredging project in accordance with 33 U.S.C. § 624. More specifically, the dispositive question is—whether the Corps complied with any and/or all of the *mandatory requirements* promulgated under the authority of that statute, namely, ER 1110–2–1300 and EP 1110–1–8.

■ If the Corps did not comply with any mandatory requirement, this alone is insufficient grounds for granting the relief sought by plaintiffs here. The proven violation of a statute or regulation does not, *ipso facto,* provide an automatic basis for injunctive relief. *CACI Field Services,* 13 Cl.Ct. at 727. Only those statutory or regulatory violations which breach the implied contract of fair consideration are grounds for injunctive relief. *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 573–74, 492 F.2d 1200, 1203–04 (1974). Therefore, plaintiffs must not only prove that applicable statutes and regulations have been violated, but that these alleged violations resulted in a breach of the implied-in-fact contract of fair consideration to which they were entitled. *CACI Field Services,* 13 Cl.Ct. at 726. In the context of this case then, the plaintiffs must first show, by clear and convincing evidence, that a mandatory statutory provision was violated, and second, that any ensuing adjustment to the government estimate would produce an awardable contract by bringing the plaintiffs' bid within 25% of that corrected estimate.

*Discussion*

■ We conclude, *infra,* that, in the preparation of its estimate, the Corps failed to comply with all of the *mandatory* requirements of ER 1110–2–1300 and EP 1110–1–8. As such, we find that the Corps also failed to prepare a fair and reasonable estimate of the costs to be incurred by a well-equipped private contractor doing the work, as required under 33 U.S.C. § 624. Moreover, we further find that the changes resulting from these mandatory adjustments increased the government's estimate by an amount sufficient to exceed the threshold amount ($8,996,800) necessary to require an awardable contract. Therefore, we find from the following discussion that

---

**16.** The other is, of course, to show that the government decisionmaking was irrational or unreasonable. Plaintiffs have not alleged such conduct as a basis for recovery and, as such, we do not address this question.

plaintiffs are entitled to the requested permanent injunctive relief.

At the outset, we observe that the merits of this case involve the application of numerous disputed complex and difficult engineering principles which are critical to the calculation of a fair and reasonable cost estimate for the dredging work in issue. The application of these principles in estimating dredging costs results in numerous mathematical calculations, which are then combined to produce a reasonable cost estimate. All parties agree that this process is governed, at least to some extent, by ER 1110–2–1300.[17] Consequently, in each area of dispute, we will address whether ER 1110–2–1300 provides *mandatory* guidance, and we will then scrutinize the manner in which the Corps prepared its B & FE, DX 7, in order to determine whether it has complied with any such mandatory requirements. If any mandatory cost estimates have not been included, we will then adjust the Corps' B & FE accordingly to conform to such regulatory requirements. At the appropriate stage, we will also analyze whether any mandatory change(s) have the effect of producing an awardable contract.

Before turning to the merits of this case, however, we feel compelled to include a brief overview of the matters covered in our subsequent discussion. This imperative is due to the complexities of the dredge estimating process, the related formulas, the factual nature of this case, and the progressive impact of changes in one part of the estimate on the other parts, many of which are inextricably interrelated. Thus, our analysis will, in the legal context described above, consider and discuss:

(i) downward adjustments to the Corps' estimate to compensate for patent mathematical errors;

(ii) the requirements necessary to produce an awardable contract;

(iii) mandatory upward adjustments in monthly costs;

(iv) the effect of those mandatory adjustments in monthly costs alone on the Corps' B & FE;

(v) mandatory adjustments in the Corps' dredging time analysis, and the total dredging costs on the Mobile River project; and

(vi) the effect of the revisions in monthly cost and dredging time analysis, and the creation of an awardable contract.

A. Preliminary Matters—Downward Adjustment in the Corps' Best & Final (B & FE) Estimate

Our primary objective is to determine whether the $11,246,000 bid of plaintiffs is within 1.25 of what the *record evidence shows the Corps' B & FE should have been.* Stated differently, the question is—when the Corps' *B & FE* is adjusted for all the mandatory costs it failed to include, does the adjusted figure fall within 25% of plaintiffs' bid?

Our starting point is the Corps' B & FE, DX 7. This is so because we deemed this estimate of $7,922,747.17 to constitute a judicial admission by the Corps and thus further proof thereof is not required. The primary components of said estimate are detailed on Appendix B, Column 1. The B & FE $7,922,747.17 total must be adjusted downward, however, to a new total of $7,656,185, in order to compensate for certain *mathematical errors* committed by the Corps in the calculation of plant mobilization costs in bid item # 1, and in estimated dredging costs for both Mud Lakes and Gaillard Island in bid item # 2. The impact of these mathematical corrections are also reflected on attached Appendix B, Column 2, for the purpose of comparison. These changes, favorable to the Corps, are explained by an examination of the manner in

---

17. The application of these engineering principles may prove difficult to understand in an abstract sense. Therefore, we have included as Appendix A a narrative explanation of the component formulas for bid item # 1, mobilization and demobilization costs, and bid item # 2, dredging costs. We do not necessarily hold that

all of these formulas are correct as a matter of law, but observe that they were employed by the Corps in the preparation of its B & FE. Moreover, plaintiffs employ these *same* general formulas to compute overall cost, but dispute the calculation of various factors in each formula.

which the costs were calculated, which we now review.

### 1. *Bid Item #2*

The changes in the Corps' B & FE are the result of errors relating more directly to bid item #2, estimated dredging costs. A thorough review of the Corps' calculation of bid item #2, dredging costs, reveals that the Mud Lakes estimated total dredging cost must be adjusted downward from $692,469.75 on DX 7 to $672,886. Likewise, the Gaillard Island estimated total dredging cost must be adjusted downward from $3,574,536 on DX 7 to $3,509,543. These changes are set forth on Appendix B, under bid item #2 dredging costs. Additionally, these aggregate adjustments result in a downward revision in bid item #2 total dredging costs for both Mud Lakes and Gaillard Island from $4,267,005.75 on DX 7 to $4,182,429 for the following reasons.

Estimating the total dredging costs reflected in bid item #2 is a function of multiplying estimated monthly costs by the estimated dredging time.[18] The adjustments set forth above are a direct consequence of errors by the Corps in the estimated monthly cost.[19] In particular, the problems are rooted in the Corps' erroneous addition of monthly dredge plant costs,[20] the primary component in the calculation of the monthly cost. As can be seen, by reference to Appendix C, in its calculation of monthly dredge plant cost, the Corps erroneously concluded that $83,236 in hourly wages per week and $31,338 in taxes, insurance, and fringes equalled $132,052. In fact, these figures equal $114,574. When this corrected figure is substituted into the monthly dredge plant cost equation, which includes plant ownership cost, operating cost and labor cost, it is plainly apparent that the Corps really intended that the monthly dredge plant costs should have been $520,450 rather than $537,928. *See* DX 8, p. 2.

This adjustment decreases the proper estimate of monthly cost for both Mud Lakes and Gaillard Island. By virtue of the decreased monthly dredge plant cost, monthly cost for Mud Lakes must be reduced from $784,392 to $764,643. Likewise, Gaillard Island monthly costs must be reduced from $1,080,035 to $1,060,285. The original and corrected versions of the monthly dredge plant cost and monthly cost are attached as Appendix C. The ultimate impact of these corrections for monthly costs, when multiplied by the Corps' estimated dredging time,[21] is the net reduction in bid item #2 discussed above and outlined in Appendix B.

### 2. *Bid Item #1*

The foregoing adjustment correcting the mathematical error in the calculation of

---

**18.** Both parties agree that the estimated *total dredging cost* which, ultimately, is the figure set forth in bid item #2, is equal to the monthly cost multiplied by dredging time. This principle may be expressed in the following formula: total dredging cost (TDC) = monthly cost (MC) × dredging time (DT), *see* Appendix A.

**19.** *Monthly cost* is computed by adding the monthly dredge plant cost, *see* note 20, *infra*, and additional costs peculiar to the project. In this case, those additional costs which the parties agree must be included are booster costs and pipeline depreciation costs for each portion of the project. The total of these three items is multiplied by 13% for overhead and bond, with the total being the monthly cost for each part of the project. This calculation is expressed in the following formula: monthly dredge plant cost + booster cost + pipeline depreciation cost + (total × 13% overhead and bond) = monthly cost. This procedure must be employed to determine the monthly cost for both Mud Lakes and Gaillard Island, *see* Appendix A.

**20.** *Monthly dredge plant cost* is equal to the estimated total of plant ownership cost, plant operating cost, and total payroll cost, *see* Appendix A.

**21.** In its B & FE, DX 7, the Corps estimated .88 of a month to complete the dredging for Mud Lakes, and 3.31 months to complete the dredging for Gaillard Island. Mathematically then, the corrected Appendix C monthly cost figure multiplied by the estimated dredging time for each respective portion of the project equals the proper total dredging costs for bid item #2 following correction of the error in addition:

Mud Lakes—corrected monthly cost, $764,643 × .88/mo. = $672,886;

Gaillard Island—corrected monthly cost, $1,060,285 × 3.31/mo. = $3,509,543;

Corrected Total Bid Item #2 = $4,182,429, *see* Appendix B.

*monthly dredge plant* cost also has an impact on mobilization and demobilization costs in bid item # 1. This is true because the cost of plant mobilization, a factor in the calculation of mobilization and demobilization, is determined by multiplying the monthly dredge plant cost by a relevant formula.[22] It is to be observed that since the dredging cost in bid item # 2 was reduced, *supra,* in view of correcting the error in calculating monthly dredge plant costs, mobilization and demobilization costs in bid item # 1 will also be reduced from $139,875.42 to $135,331 as a result of correcting the same error.[23] That follows because corrected monthly dredge plant cost is a factor in the formula for calculating mobilization and demobilization costs.

Also in the Corps' B & FE, the estimated cost of $177,441.00 for the construction of the submerged pipeline in bid item # 1 must be deleted. This revision is necessary, as plaintiffs concede, to avoid the duplication of the costs included in the second line item in bid item # 1. In short, PX 7, p. 34, detailing the $177,441, is clearly duplicated in the $2,849,862, PX 7, p. 32, which also includes the same construction costs of submerged pipeline. In sum, these two components of bid item # 1, a decrease of $4,544.42 and $177,441 in plant mobilization and construction of submerged pipeline, respectively, necessarily require a downward revision to the total from the $3,424,945.42 shown on DX 7 to $3,242,960. These revisions, which set forth the cor-

rected totals, are reflected on Appendix B for the purpose of comparison.

B. Requirements to Produce An Awardable Contract

We have, at this posture, corrected bid items # 1 and # 2 of the Corps' B & FE to adjust only for all patent mathematical errors. Because these corrections reduced the B & FE, they have all been favorable to the Corps. Consequently, the Corps' B & FE has been adjusted downward from $7,922,747.17, DX 7, to $7,656,185, *see* Appendix B. Obviously, under 33 U.S.C. § 624, the Corps is not empowered to award the contract in issue on the basis of the adjusted $7,656,185 estimate. This is so because plaintiffs' bid of $11,246,000 continues to be *more than* 25% in excess of that corrected estimate.[24]

In order to produce an awardable contract on the facts here, the Corps' fair and reasonable estimate would necessarily have to total at least $8,996,800.[25] In other words, plaintiffs must prove, by clear and convincing evidence, that the Corps' estimate must be increased by at least $1,340,-615, in conformity with a mandatory statutory or regulatory provision.[26] To make this determination, we must, therefore, scrutinize the Corps' B & FE and the trial record to determine if said B & FE was fair and reasonable in the context of applicable statutes and regulations. In doing so, we necessarily must address the Corps' calculation of monthly cost and dredging time.[27]

---

**22.** Plant mobilization costs = monthly dredge plant costs × the bond and overhead rate × days of mobilization and demobilization divided by days per month × the usage rate. The Corps calculated plant mobilization costs to be $139,-875.42.

**23.** $139,875.42 = $537,928 incorrect monthly dredge plant cost × 1.13 overhead and bond × 10 days of mobilization and demobilization divided by 30.42 days per month × .70 usage. $135,331 = $520,450 corrected monthly dredge plant cost × 1.13 × 10 divided by 30.42 × .70, *see* Appendix B.

**24.** The Corps cannot award the contract at all on the basis of its corrected $7,656,185 estimate. In fact, it could not on that estimated amount award the contract to any offeror bidding more than $9,570,231, which is an amount that does not exceed $7,656,185 by more than 25%.

**25.** $8,996,800 = plaintiffs' $11,246,000 bid divided by 1.25.

**26.** The Corps' fair and reasonable estimate must be at least $8,996,800 so as to preclude plaintiffs' bid of $11,246,000 from exceeding it by more than 25%. Therefore, in order to create an awardable contract, plaintiffs must prove that the government's estimate must be increased by $1,340,615 ($8,996,800 − $7,656,185).

**27.** Plaintiffs contest only the manner in which the Corps estimated bid items # 1 and # 2. The total dredging cost in bid item # 2 is derived by a formula in which the dredge time in months is multiplied by the monthly cost. *See* note 18, *supra.* By the very nature of this estimating formula then, the calculation of monthly cost and dredge time should both be examined. It is, of course, irrelevant which is covered first,

We will first address the manner in which the Corps calculated the estimated monthly costs for the project,[28] now that we have corrected all obvious mathematical errors.

## C. Monthly Cost

Both parties agree that the total estimated bid item # 2 dredging costs are equivalent to the monthly costs multiplied by the estimated dredging time. Therefore:

Bid Item # 2—Dredging Cost

Mud Lakes Monthly Cost × Mud Lakes Dredging Time = Mud Lakes Dredging Cost

Gaillard Island Monthly Cost × Gaillard Island Dredging Time = *Gaillard Island Dredging Cost*

TOTAL DREDGING COST.

The first step in our analysis, therefore, is an examination of the respective monthly cost calculations. Again, the parties implicitly agree that, in this case, monthly costs are determined by adding the monthly dredge plant costs and any extraordinary costs on the project. *See* ER 1110–2–1300, paragraph B–8(a)–(c) and B–9(1)–(14). Because the dredging cost estimate here was divided into two different segments, the monthly cost estimates for each were determined separately:

Monthly Dredge Plant Cost + Unusual Monthly Costs (Mud Lakes) = Mud Lakes Monthly Cost

Monthly Dredge Plant Cost + Unusual Monthly Costs (Gaillard Island) = Gaillard Island Monthly Cost.

The monthly cost applicable to each portion of the project is, as demonstrated above, the first factor in the dredging cost analysis in bid item # 2. Consequently, in our review of the Corps' estimated monthly cost, we must scrutinize the Corps' calculation of (1) monthly dredge plant costs applicable to both Mud Lakes and Gaillard Is-

land; and (2) extraordinary monthly costs peculiar to both Mud Lakes and Gaillard Island. We address each of these three in order, along with the elements which compose them. First, of course, are the overall monthly dredge plant costs.

### 1. *Monthly Dredge Plant Costs*

Monthly dredge plant costs are equal to the estimated total of three factors—(i) plant ownership costs, (ii) plant operating costs, and (iii) total labor costs. Plaintiffs contest the Corps' calculation of plant ownership costs and labor costs, but do not dispute the Corps' estimated plant operating costs applicable to the performance of Mud Lakes and Gaillard Island.[29] We consider plant ownership costs first and labor costs second.

#### a. Plant Ownership Costs

The Corps, as part of its B & FE, calculated plant ownership costs for this bid estimate at $64,371 per month, DX 8, p. 1. The Corps, however, committed several errors in this calculation. The Corps used an incorrect depreciation rate of 4.5% for a crew work boat, instead of the mandatory 9.5% required by EP 1110–1–8, p. 2.[30] Moreover, the Corps failed to double the depreciation and CFC amounts, by accounting for the acquisition of two pieces each of the following equipment—tugs, work barges, and skiff with motor. The Corps itself conceded the need to double such costs when multiple pieces of equipment were being considered. Tr. 793–794. These mandatory corrections increase the *annual* depreciation and interest costs regarding annual plant ownership costs. The total of annual depreciation costs and annual interest costs must then be divided by

but the correction of one may be sufficient to increase the Corps' estimate enough without regard to a consideration of the other.

**28.** Monthly costs have a direct impact on the calculation of dredging costs in bid item # 2, *see* note 19, *supra.* On the other hand, monthly costs have only an indirect impact on plant mobilization costs in bid item # 1.

**29.** Except, however, plaintiffs do object to the omission of fuel costs attributable to the operation of the pipeline boosters. However, as that fuel cost varies for each portion of the project,

the Gaillard Island boosters requiring more fuel than Mud Lakes, that cost is considered as an extraordinary operating cost in calculating monthly cost. *See infra.*

**30.** EP 1110–1–8, Volume 3 (December 1, 1988) is a pamphlet referenced by ER 1110–2–1300. The EP "establishes predetermined equipment ownership and operating expense rates for use in preparation of estimates ...," EP 1110–1–8, paragraph 1, applicable to all civil works construction projects in the southeast region, including Alabama, EP 1110–1–8, paragraph 2.

the number of available working months per dredge year to determine the *monthly* plant ownership cost. The Corps used 10 working months per dredge year, because of the perceived extension of the working months per year in Alabama apparently due to alleged favorable weather.[31]

Plaintiffs, relying on EP 1110–1–8, paragraph 3, and the applicable tables in the EP, correctly assert that the Corps violated the mandatory requirements of that section. Therein, it states that "... the average use per year for Region III [Alabama] *shall be* eight months" (emphasis added). Consequently, using an eight-month average use rate and the corrected depreciation figures, plaintiffs arrived at a monthly plant ownership cost of $85,091.[32] We embrace this corrected amount as being required by EP 1110–1–8, which is incorporated by reference in ER 1110–2–1300, and the testimony of Mr. Mears. Consequently, we reject the Corps' estimated plant ownership cost of $64,371 and find that $85,091 is the fair and reasonable monthly plant ownership cost of a well-equipped contractor doing the work.

### b. *Labor Cost*

Plaintiffs next dispute the Corps' estimated monthly labor cost. Specifically, plaintiffs contend that, given the fact that the dredge will operate on three shifts per day, the Corps' labor estimate is based on an undermanned crew for both management and hourly personnel, DX 8, p. 2. Plaintiffs cite no authority for their contention that increased labor cost is required for this project, but we find that such imperative exists, nevertheless, on two bases. First, ER 1110–2–1300, paragraph B–9(5) requires the Corps to include crew labor costs in the monthly dredge plant cost estimate. It does not, however, specify the number of crew, neither minimum, maximum, nor otherwise. Nevertheless, we observe that the ER emphasizes that the size

of the crew "will vary with dredge size and *job conditions*" (emphasis added).

Plaintiffs' figures are, however, substantiated by PX 14 and the "dredge size and job conditions." There plaintiffs introduced into evidence a modified schedule containing its opinion of the number of crew necessary for the dredging project in issue, *i.e.,* job conditions, with specific reference to an admitted three shift crew, DX 8, p. 2. Defendant's counsel did not object in any way to the admissibility of this exhibit. Tr. 280–281. It is therefore in evidence for the truth of the matter asserted. Thus, we find that the Corps' failure to object is a tacit, if not implicit, admission of the efficacy of those numbers and conditions measuring an increase in the Corps' estimated labor force. Moreover, due to the absence of any countervailing evidence to suggest that a well-equipped contractor would need anything less than the crew contended by plaintiffs, we find that the labor costs averred as fair and reasonable by plaintiffs must, therefore, be incorporated into the Corps' estimate as fair and reasonable under the circumstances.

These increased costs, in the management area, consist of increases as follows: captain from one to two; civil engineer from one to two; and office manager from zero to one, PX 14; *see also* DX 8, p. 2. With respect to the hourly personnel, the increases are as follows: dredge mates from two to three; tug masters from two to three; tug mates from three to six; and dump foremen from two to three, PX 14; DX 8, p. 2. The foregoing changes (increases) in plant ownership costs, and labor costs, as explained *supra*, result in adjusted monthly dredge plant costs of $569,779 as detailed on Appendix D, PX 7, p. 20; PX 14; and DX 8, pp. 1, 2.

### 2. *Extraordinary Mud Lakes Monthly Costs*

Turning now to the additional Mud Lakes monthly costs, both parties agree that

---

31. The Corps, DX 8, estimated plant ownership cost as: depreciation, $235,267 + interest, $408,-444 = $643,712 per year divided by 10 months per year = $64,371 per year. DX 8, p. 1.

32. Plaintiffs, relying on the *corrected* figures and months per year established by EP 1110–1–8, calculated plant ownership cost as: depreciation, $272,284 + interest, $408,444 = $680,-728/year divided by 8 months/year = $85,091.

there are at least some particularized costs that must be included in a fair and reasonable estimate. These costs, when added to the fair and reasonable monthly dredge plant costs, equals the total monthly cost for Mud Lakes. Given the foregoing findings of increases in plant and labor costs, the fair and reasonable monthly dredge plant cost applicable to *both* Mud Lakes and Gaillard Island recalculates from $520,450 to $569,779. Thus, the issue before us now is what monthly costs peculiar to Mud Lakes must be included here.

In its B & FE for Mud Lakes, the Corps did indeed add some particularized monthly costs to the overall dredge plant costs to determine its total estimated monthly cost for that part of the work. These special costs accounted for the use of a booster, pipeline depreciation, and 13% for overhead and bond, DX 7, p. 2. Thus, *the Corps' B & FE*, as corrected to compensate for the aforementioned mathematical errors in its calculation of monthly dredge plant costs, *see* Appendix C, p. ——, shows a total monthly cost of $764,643.[33] Its analysis of these costs are:

Mud Lakes

| | |
|---|---|
| Monthly Dredge ·Plant Cost | $520,450 |
| Booster Cost | 110,000 |
| Pipeline Depreciation Cost | 46,225 |
| Subtotal | $676,675 |
| 13% Overhead and Bond | 87,968 |
| TOTAL MONTHLY COST | $764,643. |

Plaintiffs agree that a monthly cost for the one booster, the pipeline depreciation, and 13% overhead and bond must be included in a fair and reasonable estimate. However, they contend that a higher monthly cost for Mud Lakes is required because the monthly cost estimate does not adequately account for monthly fuel costs. Plaintiffs contend that while the Corps included monthly fuel costs for the main dredge plant in its calculation of monthly dredge plant costs, it did not include any monthly cost calculation for fuel to be consumed by the booster and other attendant plant. According to plaintiffs, inclusion of this monthly cost would add another $40,627 to the total monthly cost.[34] If plaintiffs' contention is proven, these changes would also require a recalculation of overhead and bond. In sum, plaintiffs contend that total monthly cost for Mud Lakes should include the following additional items:

Mud Lakes

| | |
|---|---|
| Monthly Dredge Plant Cost | $569,779 |
| Booster Cost | 110,000 |
| Additional Fuel Cost | 40,627 |
| Pipeline Depreciation Cost | 46,225 |
| Subtotal | $766,631 |
| 13% Overhead and Bond | 99,662 |
| TOTAL MONTHLY COST | $866,294. |

We find that plaintiffs' contentions with respect to the proposed increase in Mud Lakes monthly cost are in fact mandatory. The upward revision of the monthly dredge plant cost to $569,779 has already been proven by clear and convincing evidence. The inclusion of $40,627 in additional fuel costs is also a mandatory requirement under ER 1110–2–1300, paragraph B–9(6) and B–9(14). Under the regulation, we find that it is incumbent on the Corps to esti-

---

**33.** The Corps' B & FE uncorrected for the mathematical errors included the same unusual factors, *see* Appendix C:

| | |
|---|---|
| Monthly Dredge Plant Cost | $537,928 |
| Booster Cost | 110,000 |
| Pipeline Depreciation Cost | 46,225 |
| Subtotal | $694,153 |
| 13% Overhead and Bond | 90,240 |
| TOTAL MONTHLY COST | $784,392. |

**34.** Plaintiffs calculated this amount using a formula supplied by the Corps' Mr. Mears during trial. Thus, $40,267 = 4,500 horsepower $\times$ 12 hours per day $\times$ 30 days per month $\times$ .067 of a gallon per hour $\times$ .70 $\times$ .55 gallon. Tr. 813–816, 824.

mate and include fuel costs beyond that to be consumed by the main dredge, *see id.*, paragraph B–9(14). This is necessarily true in those cases such as this one, which contemplate the use of a significant number of extra pieces of fuel-burning equipment, the boosters in particular. These mandatory adjustments automatically require a corresponding increase in the overhead and bond costs, which are admittedly 13% of the monthly cost subtotal. Given the foregoing, we find that plaintiffs have proven, by clear and convincing evidence, that a fair and reasonable estimate of Mud Lakes' total monthly cost must be at least $866,294.

### 3. *Extraordinary Gaillard Island Monthly Costs*

We have already reviewed the Corps' calculation of monthly dredge plant costs, which apply equally to both Mud Lakes and Gaillard Island. Moreover, we have previously concluded that a fair and reasonable estimate of those costs is at least $569,779. Now we undertake the third and final step in our three-part monthly cost analysis. Here we examine the Corps' calculation of monthly costs peculiar to Gaillard Island.

The Corps prepared an estimate of these costs in the same manner it prepared its monthly cost analysis for Mud Lakes. Thus, it estimated monthly cost for Gaillard Island by adding monthly dredge plant costs, the monthly cost of three boosters, pipeline depreciation costs, and 13% for overhead and bond. Consequently, the Corps' B & FE, as previously corrected to compensate for the mathematical errors in its calculation of monthly dredge plant costs, *see* Appendix C, shows a total monthly cost of $1,060,285.[35] The summary of these costs is as follows:

**Gaillard Island**

| | |
|---|---|
| Monthly Dredge Plant Cost | $ 520,450 |
| Booster Cost | 330,000 |
| Pipeline Depreciation Cost | 87,855 |
| Subtotal | $ 938,305 |
| 13% Overhead and Bond | 121,980 |
| TOTAL MONTHLY COST | $1,060,285. |

Plaintiffs again argue that these additional monthly costs applicable to Gaillard Island must also be reflected as a fair and reasonable component of the Corps' estimate. Thus, plaintiffs again dispute the Corps' estimation of monthly plant costs applicable to Gaillard Island as a result of its failure to include monthly fuel costs for the three boosters and attendant plant, and the concomitant increase in monthly costs for overhead and bond. Plaintiffs argue that the inclusion of a *corrected* $569,779 monthly dredge plant cost, plus $95,764 in monthly fuel costs,[36] and the required increase in overhead costs must also be reflected as a part of a fair and reasonable estimate of monthly cost regarding Gaillard Island. Accordingly, plaintiffs assert that Gaillard Island monthly costs *must* include the following:

**Gaillard Island**

| | |
|---|---|
| Monthly Dredge Plant Cost | $ 569,779 |
| Booster Cost | 330,000 |
| Additional Fuel | 95,764 |
| Pipeline Depreciation Cost | 87,855 |
| Subtotal | $1,083,398 |
| 13% Overhead and Bond | 140,842 |
| TOTAL MONTHLY COST | $1,224,240. |

We are constrained to employ the same analysis here as we did for the Mud Lakes monthly cost analysis because the Corps' alleged shortcomings are identical. As such, we find that the total Gaillard Island monthly cost estimate must be increased to

---

35. The Corps' *uncorrected* B & FE included the same additional factors, *see* Appendix C, p. ——, but at a higher cost of $1,080,035:

| | |
|---|---|
| Monthly Dredge Plant Cost | $ 537,928 |
| Booster Cost | 330,000 |
| Pipeline Depreciation Cost | 87,855 |
| Subtotal | $ 955,783 |
| 13% Overhead and Bond | 124,252 |
| TOTAL MONTHLY COST | $1,080,035. |

36. $95,764 = 13,500$ horsepower for three pipeline boosters $\times$ 12 hours per day $\times$ 30 days per month $\times$ .067 of a gallon per hour $\times$ .70 $\times$ .55 of a gallon, *see* note 33, *supra*.

at least the $1,224,240 proposed by plaintiffs, and as supported by the record. This is so because the $569,779 monthly dredge plant cost has been clearly proven. Moreover, the booster cost of $330,000 is conceded, the additional fuel costs are required by ER 1110–2–1300, paragraphs B–9(6) and B–9(14), and the overhead and bond costs are appropriately required by the increased total of all the Gaillard Island monthly costs. We find, therefore, that these adjustments are mandatory, and that they must be included in a fair and reasonable estimate of Gaillard Island's monthly costs by the Corps.

In summary, we observe that our analysis has resulted in an upward revision of the estimated monthly dredge plant cost from the previously corrected figure of $520,450 to $569,779. This modification in and of itself required an upward adjustment of the estimated total monthly cost for both Mud Lakes and Gaillard Island. However, plaintiffs have proven that additional adjustments are required to account for necessary fuel costs and additional bond and overhead costs for both segments of the work. As a result, we find that plaintiffs have shown, by clear and convincing evidence, that the monthly cost for Mud Lakes must be increased to at least $866,294, and Gaillard Island to at least $1,224,240. Clearly, such changes are a significant increase over the corrected Corps' estimates, $764,643 and $1,060,285, respectively, *supra.*

However, these adjusted figures do not, *ipso facto,* constitute the sole basis for the estimation of bid item # 2 dredging costs. The monthly costs make up only the first half of the formula for determining bid item # 2 dredging costs, and do not account for any alteration in estimated dredging time. Consequently, it is evident that a change in the monthly cost will have an impact on the total dredging cost estimate, even without any adjustments in the dredging time factor. Due to the proven substantial increases in monthly cost alone, we next examine what impact these changes have on the total Corps' estimate. As we shall see, these monthly cost increases alone, when properly considered, very nearly create an awardable contract.

D. Effect of Adjusted Monthly Cost Alone on the Corps' Estimate

While we have considered only those mandatory adjustments in monthly cost, it is clear that these relatively minimal adjustments have a substantial impact on the government's B & FE. There being no dispute between the parties as to the fairness and reasonableness of the estimated cost of bid items # 3 and # 4, we now consider, in turn, the impact on the government's B & FE of any duly proven changes in bid items # 1 and # 2.

1. *Adjustments in Bid Item # 1*

The parties implicitly agree that any change in monthly dredge plant costs will require a corresponding adjustment in the estimated plant mobilization costs, *see* note 22, *supra.* The Corps' estimate of plant mobilization costs has already been changed to $135,331 to compensate for the mathematical errors caused by its miscalculation of monthly dredge plant costs. Plaintiffs now contend that those plant mobilization costs should be $233,966, based on the duly proven monthly dredge plant costs of $569,779 and mobilization of boosters allegedly overlooked by the Corp.[37] While this contention appears to be reasonable at first blush, plaintiffs have not proven such necessity by citation to any authority in the regulations. Thus, the increase in mobilization cost to $233,966 proposed by plaintiffs as a result of including the booster costs must be rejected. We do, however, find that the estimated plant mobilization cost must be increased from the Corps' corrected estimate of $135,331 to $148,158. This increase is supported by the mandatory monthly dredge plant revisions from a corrected $520,450 to a fair and reasonable adjustment of $569,779.[38]

---

37. Plaintiffs calculated plant mobilization cost of $233,966.20 = $569,779 monthly dredge cost + $330,000 monthly booster cost × 1.13 for overhead and bond × 10 days of mobilization and demobilization divided by 30.42 days per month × .70 usage.

38. This corrected plant ownership cost of $148,-158 = $569,779 corrected monthly dredge plant cost × 1.13 for overhead and bond × 10 days for mobilization and demobilization divided by 30.42 days per month × .70 usage.

Thus, we conclude that an increase of $12,827 in plant mobilization is warranted.

The plaintiffs do not contest the estimated cost of the third component of mobilization and demobilization costs in bid item # 1, *i.e.*, $257,767 for pipeline demobilization. Plaintiffs do, however, contest the Corps' estimate of the second element, the estimated costs for construction of submerged pipeline. They argue that a fair and reasonable estimate requires a revision of this cost from $2,849,862 to $3,503,367. Again, no mandatory authority is cited to by plaintiffs requiring the Corps to construct its estimate in such a way that would produce an estimated cost mirroring that higher amount proposed by plaintiffs. In support of their position, plaintiffs rely upon PX 15, a pipeline construction cost estimate submitted by Steel Processors, Inc., dated November 22, 1989, which is substantially in excess of the cost estimate used by the Corps.[39] Plaintiffs contend that the quoted $9.55 per foot overall pipeline construction price reflected on that exhibit supports a total estimated cost of $3,503,367 as a fair and reasonable cost for pipeline construction costs in bid item # 1. Tr. 291–294.[40]

The court observes that the only probative evidence for the alleged increased linear foot pipeline construction cost estimate is PX 15. We further observe that said document was apparently obtained *post litem motam.*[41] Moreover, plaintiffs failed to adduce the testimony of the preparer of said exhibit, relying instead on the testimony of Mr. Taylor, their estimator, alone. Mr. Taylor allegedly received this information as an oral quotation at the time plaintiffs prepared their bid, and subsequently obtained this written quotation after litigation commenced. Tr. 359–360.

Nevertheless, when PX 15 was offered into evidence, the Corps failed to object to its admissibility, particularly the efficacy of the dollar quotes asserted in PX 15. Instead, the Corps' counsel merely objected to any speculation contained in the exhibit concerning what competitors might quote on the construction of submerged pipeline. Tr. 292. Consequently, we find that Steel Processors, Inc.'s $9.55 submerged pipeline *aggregate* quote was received into evidence for the truth of the pricing matters asserted. At no subsequent time did the Corps attack the validity of those quoted amounts for estimated pipeline construction costs based on PX 15. We therefore find that plaintiffs have proven the higher submerged pipeline costs by the required quantum of clear and convincing evidence since the record contains no independent evidence rebutting that construction cost estimate.

As a result, we find that the second component of mobilization and demobilization costs in bid item # 1 for pipeline construction costs must be increased from the $2,849,862 in the Corps' estimate to $3,503,367. This finding results in a proven mandatory increase of $653,505 for pipeline construction costs. When added to the $12,827 increase, *supra*, in plant mobilization costs, bid item # 1 necessarily reflects a total proven increase of $666,332. These changes are reflected in the total on Appendix F, which summarizes the mandatory changes and their impact on a fair and reasonable estimate. We find, therefore, that a fair and reasonable estimate for mobilization and demobilization costs under bid item # 1 must be increased to $3,909,292 from $3,242,960. *See* Appendix F, bid item # 1.

### 2. *Adjustments in Bid Item # 2*

The proven mandatory monthly cost adjustments, *supra*, also have an impact on

---

**39.** The Corps apparently calculated pipeline construction cost at $2.30 per linear foot. This figure is the result of dividing the $177,441 construction cost, *see* PX 7, p. 34, by the 77,000 linear feet of submerged pipeline the Corps expected to use on the Gaillard Island portion of the project, *see* PX 7, p. 4.

**40.** $3,503,367 = [ (77,000 linear feet of pipeline × $9.55 per linear foot) + actual pipeline purchase cost of $2,364,975, *see* PX 7, p. 32] × 1.13 for overhead and bond.

**41.** PX 15 is dated November 22, 1989, whereas plaintiffs' complaint was filed in this court on November 7, 1989, and the trial commenced on November 29, 1989.

dredging costs in bid item # 2, even if no adjustments are made in estimated dredging time. As we have found above, a fair and reasonable monthly cost estimate for Mud Lakes is no less than $866,294, while a fair and reasonable estimate of the monthly cost for Gaillard Island is at least $1,224,240. If these adjusted monthly cost estimates are factored into the bid item # 2 dredging cost equation [42] prior to addressing estimated dredging time, the estimated total dredging cost will increase from the $4,182,429 adjusted Corps' estimate to $4,814,573.[43] This is an increase of $632,144 which, when added to the already proven mandatory $666,332 increase in mobilization and demobilization costs for bid item # 1 produces a total *increase* in bid items # 1 and # 2 of $1,298,476. Thus, it is plainly apparent that the proven mandatory adjustments in monthly cost alone very nearly exceed the $1,340,615 needed to produce an awardable contract, which increase falls short by only $42,139. We find that that difference is supplied by a required adjustment in at least one factor in the estimated dredging time analysis, *infra*.

E. Mandatory Adjustments in Dredging Time Analysis

In view of the Corps' continuing inability to award the contract under 33 U.S.C. § 624 as a consequence of the foregoing increases in monthly cost alone, we must now scrutinize the Corps' dredging time calculations to determine whether the manner in which they were determined complies with the requirements of ER 1110–2–1300. The parties have spent the lion's share of their energy vigorously contesting the proper calculations necessary to determine estimated dredge production capacity. The production rate is the key factor in estimating monthly dredging time, but is also the most difficult and complex calculation in the entire estimating process, *see* ER 1110–2–1300, paragraph B–4(a) *et seq. See also* Appendix A. Consequently, it is the Corps' calculation of production upon which we must focus our attention.

According to ER 1110–2–1300, paragraph B–4(c), in estimating the production rate for a pipeline dredge, one *must* consider a number of variables. In Table B–1, the regulation quantifies average production based on an average configuration of three primary variables, dredge size, horsepower, and pipeline length. The regulation then provides a format for modifying that data for actual conditions, *see* ER 1110–2–1300, paragraph B–4(c). Thus, the average production data set forth in ER 1110–2–1300, Table B–1, must be modified to account for actual pipeline length, B–4(d)(1), the effect of horsepower, B–4(d)(2), the addition of booster pumps, B–4(d)(3), the type of material to be dredged, B–4(d)(4), and the shoal, B–4(d)(5). "The result of the modified data is the anticipated hourly production...." B–4(d).

The Corps did not rely entirely upon the guidelines of the regulation when computing its production rate estimates, the key factor in calculating dredging time. Rather, it relied primarily upon historical records of previous maintenance dredging projects in the Mobile River. Tr. 391, 573–574. In fact, Mr. Warren relied almost solely upon the record performance of another Mobile River dredging contract because he considered that project to be very similar to the project for which he was preparing his estimate. Tr. 392. As authority for its reliance upon historical records in production capacity calculation,

---

**42.** *See* Appendix A, Bid Item # 2 Dredging Cost:
    1. Mud Lakes dredging cost = monthly cost × dredging time;
    2. Gaillard Island dredging cost = monthly cost × dredging time.

**43.** The Corps' B & FE, DX 7, p. 3, calculated that it would take .88 of a month to dredge that portion of the channel whose material would be dumped in the Mud Lakes disposal area, and 3.31 months for Gaillard Island. By inserting these values into the cost × time equation, the results are as follows:
    *Mud Lakes*—.88 Corps' time estimate × $866,294 fair and reasonable monthly cost = $762,339;
    *Gaillard Island*—3.31 Corps' time estimate × $1,224,240 fair and reasonable monthly cost = $4,052,234; and
    Total bid item # 2 dredging cost: $762,339 + $4,052,234 = $4,814,573.

the Corps cited to ER 1110–2–1300, paragraph B–4(a):

> Undoubtedly, *the simplest and most reliable approach for estimating dredge production is to rely upon dredging records for the same or similar type work performed previously by the same or at least a similar dredge.* The purpose of this discussion is to enable a person to estimate monthly dredge production for a particular type and size dredge when previous dredging records do not apply, do not exist, or are not available....

(emphasis added).

The Corps estimated the production capacity, based on historical records, to be 4,874 cubic yards an hour for Mud Lakes, DX 7, p. 2, and 3,948 cubic yards an hour for Gaillard Island, DX 7, p. 4. These rates were based, in part, upon certain assumptions:

(i) a 30–inch hydraulic pipeline dredge;

(ii) 5,200 total horsepower on the main dredge, Tr. 722, 725–726;

(iii) 72,000 feet of pipeline, divided into four 18,000–foot segments, DX 6, Tr. 398–399;

(iv) the use of one 4,500–horsepower booster for Mud Lakes; and

(v) the use of three 4,500–horsepower boosters for Gaillard Island.

Plaintiffs, on the other hand, contend that production capacity should be 4,500 cubic yards per hour for Mud Lakes, PX 10, and 1,758 cubic yards per hour for Gaillard Island. Tr. 258; PX 10. These production rates were based, in part, on an analysis of the same factors the Corps used, PX 10:

(i) a 30–inch hydraulic pipeline dredge;

(ii) 5,200 total horsepower on the main dredge;

(iii) 72,000 feet of pipeline, divided into four 18,000–foot segments;

(iv) the use of one 4,500–horsepower booster for Mud Lakes; and

(v) the use of three 4,500–horsepower boosters for Gaillard Island.

The production rate analysis is significant because it determines the number of hours it will take to dredge a portion of the project.[44] Thus, the Mud Lakes production rate enables an estimator to compute the total number of hours to dredge Mud Lakes. The Corps estimated that it would take a maximum of 358.46 total hours to complete the Mud Lakes segment of the work. It estimated that 358.46 hours was the equivalent of 25.6 days of dredging by dividing 358.46 by 14 effective dredging hours per day, DX 7, p. 3.[45] Thus the equation is as follows:

$$\frac{358.46 \text{ total hours}}{14 \text{ dredging hours per day}} = 25.6 \text{ total dredging days.}$$

The total dredging days were then converted to a monthly dredging time to permit the calculation of total dredging cost (monthly cost $\times$ dredge time in months). To accomplish this, the Corps divided the 25.6 total number of dredging days by the effective number of days in a dredging month[46] on the Mobile River, which it estimated as being 29 days:

$$\frac{25.6 \text{ total dredging days}}{29 \text{ effective monthly dredging days}} = .88 \text{ of a month to dredge Mud Lakes.}$$

The Corps applied an identical analysis to the Gaillard Island portion of the project.

---

**44.** The total number of hours required to perform each of the two portions of the project in issue must be calculated by adding the dredging times for the various channel segments in each of the two project portions. Tr. 619. Time in hours is dependent upon either the speed with which the dredge can physically advance through the channel, or the dredge pump production capacity, *i.e.*, the number of cubic yards of material the dredge can pump in an hour. For any given segment of the channel, the estimated maximum dredging time in hours is the greater of the "advance rate" or the "production rate." Tr. 137–142, 160–161, 481.

**45.** Effective dredging hours per day is the number of hours per day the dredge is actually excavating and discharging material from the channel bottom:

$$\frac{\text{dredging hour}}{\text{dredging hours/day}} = \text{dredging time in days.}$$

**46.** Effective dredging days per month are the number of days per month that the dredge is actually working:

$$\frac{\text{dredging time in days}}{\text{dredging days per month}} = \text{dredging time in months.}$$

Based upon the estimated production rate for that part of the work, 3,948 cubic yards per hour, the Corps calculated that it would take no more than 1,057.04 hours to dredge that portion of the channel. Dividing that figure by 11 "effective dredging hours per day," the Corps calculated that it would take 96.09 days to do the dredging, DX 7, p. 5:

$$\frac{96.09 \text{ total dredging days}}{29 \text{ effective monthly dredging days}} = 3.31 \text{ months to dredge Gaillard Island.}$$

From the foregoing, it is apparent that a reduction in the production rate would, of course, increase the total dredging hours, increasing the total dredging days and the total dredging months in turn. It is equally clear that there are a number of production rate variables that, undoubtedly, may be subject to mandatory correction under ER 1110–2–1300. To effect the foregoing, the plaintiffs have focused their attention on the Corps' alleged failure to properly account for horsepower variations between the historical record upon which it relied and the modifying formulas set out in ER 1110–2–1300.[47]

Notwithstanding the perceived omissions by the Corps, we find that an extensive analysis of the dredge production variables is unnecessary. This is so because production rate is only part of the formula by which monthly dredging time is calculated. We can focus our attention upon either the Corps' estimates of effective dredging time per day, 14 hours per day for Mud Lakes and 11 hours per day for Gaillard Island, or upon the estimated effective dredging time per month. Plaintiffs do not contest the Corps' estimated effective dredging time per day for either Mud Lakes or Gaillard Island. They do, however, contest the use of 29 effective dredging days per month. Our analysis here, therefore, is divided into two parts, the first being devoted to what we view as the Corps' improper use of 29 effective dredging days per month as the proper quotient by which it converted daily

dredging time to monthly dredging time, and the second being the impact of a revised use of 26 effective dredging days per month as *the* proper figure to employ in that formula. We conclude, as demonstrated below, that, when applied, this revision is more than enough to produce an awardable contract.

**1.** *Effective Dredging Days Per Month*

ER 1110–2–1300, paragraph B–4(d)(6)(b), addresses the subject of effective monthly dredging time. It states in part that:

... the number of operating days per month *is* less than 30 due to holidays, inclement weather, repairs, relocations, disposal constraints, and less than 7 days per week of operation. *The number of operating days normally averages between 20 and 26 based on 7 days operation per week.* The rationale for these times estimates *should* be part of the Government estimate....

(emphasis added).

This provision of the regulations does not dictate to the Corps to use any specified or aggregate number of effective working days to constitute a dredge month, but we find that it clearly envisions the use of between 20 and 26 days *under normal circumstances*. The cited rationale for the number of days, therefore, "should" be part of the estimate. This is particularly true when the Corps seeks to employ a figure which is significantly outside the norm contemplated by the regulations, and there is no creditable evidence to establish that any of the circumstances envisioned by the statute did not obtain which would warrant other than the average number of operating days per month. For the reasons stated below, we therefore find that plaintiffs have proven, by clear and convincing evidence, that the Corps' use of 29 effective operating days to constitute a dredge month is not a fair and reasonable

---

**47.** The historical dredging records relied upon by the Corps were assumed to be based on 5,200 horsepower dredges. Plaintiffs demonstrated that the project relied upon by the Corps, the Bill James project, was actually performed with an 8,700 horsepower dredge, JX 1. According to plaintiffs, this erroneous horsepower assumption by the Corps caused a series of miscalculations, which, when corrected, are the bases for the reduced production rates proposed by plaintiffs.

manner in which to calculate a dredging month as envisioned by the regulations.

We make this finding for three reasons. First and foremost, the Corps' estimator, Mr. Warren, used 25 effective working days to constitute a dredge month as the basis for his Mud Lakes and Gaillard Island dredging calculations on no less than *three* previous estimates. Specifically, he used 25 days in his Original Estimate, *see* PX 7, pp. 3, 4, 6, 8, and in his Revised Estimate, *see* PX 7, pp. 27, 29. In addition, Mr. Warren did not alter the use of 25 effective dredging days per month when he modified his revised estimate by $203,406 during direct examination. Tr. 481. In fact, Mr. Warren used 25 days as a dredge month throughout the estimating process, up until the trial was half over, and after he had heard and apparently dissected the testimony of plaintiffs' estimator. At that time, he had the opportunity to review and hospitably modify his own estimates. We find it rather transparent as to why Mr. Warren did not use 29 effective working days per dredge month until the Corps' B & FE was introduced on the third day of trial.[48]

Secondly, we find the use of 29 effective work days per month to be an untenable afterthought because the Corps has provided no supporting and creditable rationale beyond the uncorroborated testimony of Mr. Warren. He testified, after quoting the relevant language of ER 1110–2–1300, paragraph B–4(d)(6)(b), that his use of 29 days was based upon an examination of historical records for previous Mobile River dredging projects. Tr. 607. He allegedly discovered, after taking the three-day weekend break in trial to research the matter, that no effective working days had been lost on those projects due to the causes listed in ER 1110–2–1300, paragraph B–4(d)(6)(b), namely, inclement weather, repairs, relocations, disposal constraints, and less than seven days per week operation. Thus, although he felt those records justified the use of 30 days, Mr. Warren decided

that 29 days was an appropriate number to use for a dredge month in his B & FE.

Surprisingly, the Corps did not introduce any of these so-called records to corroborate the testimony of Mr. Warren. Moreover, it did not, for whatever reason, explain its failure to do so. It is well established that the failure to produce evidence which would allegedly support the assertions of that party warrants an adverse inference in the absence of an adequate explanation for its omission. *Morowitz v. United States*, 15 Cl.Ct. 621, 631 (1988), *citing Interstate Circuit, Inc. v. United States Department of Treasury*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1938); *Lepkowski v. United States*, 256 U.S.App.D.C. 281, 804 F.2d 1310, 1323 (1986). Thus, the Corps' unexplained failure to introduce the very evidence which allegedly supports the use of 29 days, rather than the 25 days utilized over the three previous estimates, forces us to conclude that those records, if proffered, would not support the tenuous assertions made by Mr. Warren.

Thirdly, we observe that Mr. Warren has apparently never used 29 effective working days per month as a basis for estimating other projects in his district. Rather, he has customarily used 25 days per month, based upon his own historical estimating experience in the Mobile region, Tr. 665. Mr. Warren has prepared some 300 estimates for the Corps, Tr. 386–387, which experience has been accumulated over 15 years of employment with the Corps in the Mobile District, Tr. 384. While the use of 25 effective dredging days per dredge month appeared to be reasonable by Mr. Warren in all these other cases, his *post litem motam* examination of alleged historical dredging records convinced him that the use of 29 days was appropriate in this case alone, Tr. 665–666. If such records reasonably supported the modification as claimed, then, of course, they should have been adduced. Because of such unexplained failure, we cannot agree with Mr.

**48.** Trial commenced on November 29, 1989. Mr. Warren took the stand on November 30, 1989. On direct examination, Mr. Warren altered his estimate by correcting mathematical errors in bid item #1 only. Tr. 480. Trial reconvened on December 4, 1989, after a three-day weekend.

Warren and are compelled to find that some figure within the rationale of the regulatory parameters is required to be used in the Corps' estimate in the absence of a well-substantiated reason for diverging from those guidelines.

### 2. *Impact on Total Bid Item #2, Dredging Cost*

We are convinced that the record, as explained above, provides a substantial basis for finding that Mr. Warren should have continued in his use of 25 effective dredging days per dredge month in his calculation of the government's B & FE. Had he done so, given the other adjustments, *supra,* clearly the resulting estimate would have generated an awardable contract. In fact, we find that even the highest regulatory average of 26 days is sufficient when properly factored to produce an awardable contract after being coupled with the corrected monthly costs, *supra.* These changes will all be reflected in bid item #2, total dredging costs, and are summarized on Appendix F.

#### a. Mud Lakes

The Corps, using 29 effective dredging days per dredge month, estimated that it would take .88 of a month to complete the Mud Lakes dredging. However, the clearly proven correction of this one element in the dredging time analysis by using a 26–day rather than a 29–day dredge month, produces a dramatic increase in estimated dredging cost:

$$\frac{25.6 \text{ Corps' estimated dredging days}}{26 \text{ effective dredging days per month}} = \text{.98 of a month to accomplish the task.}$$

To determine total dredging cost for Mud Lakes, therefore, the .98 of a month of dredging time must be multiplied by $866,-294, the corrected monthly cost for Mud Lakes:

.98 of a month × $866,294 monthly cost = $848,968.

The bid item #2 dredging costs for Mud Lakes, therefore, when corrected for monthly cost and effective dredging days constituting a dredge month is $848,968, not the Corps' estimated $672,886, *see* Appendix F. This is an increase of $176,082

for Mud Lakes, which must be added to the bid item #2 dredging cost increases for Gaillard Island, *see infra.*

#### b. Gaillard Island

The same analysis applies equally to Gaillard Island estimated bid item #2 dredging costs. The Corps, by using 29 effective dredging days per month, estimated that a private well-equipped contractor would need 3.31 months to complete this aspect of the job. The clearly proven change from 29 to 26 days equalling a dredge month results in a substantial adjustment:

$$\frac{96.09 \text{ Corps' estimated dredging days}}{26 \text{ effective dredging days}} = 3.70 \text{ months.}$$

The 3.70 months to accomplish the Gaillard Island portion of the project, when multiplied by the $1,224,240 corrected monthly cost for Gaillard Island, equals $4,529,688 for dredging this phase of the project. We, therefore, reject the Corps' estimated amount of $3,509,543, *see* Appendix F. This is a $1,020,145 increase in the bid item #2 Gaillard Island dredging costs.

#### c. Total Bid Item #2 Dredging Costs—Corrected

When the adjusted bid item #2 dredging costs are added together, *see* Appendix F, the following are the results:

| | |
|---|---|
| Mud Lakes | $ 848,968 |
| Gaillard Island | $4,529,688 |
| Fair and Reasonable | $5,378,656. |

This adjusted dredging cost figure is the total bid item #2 cost, not the $4,182,429 total bid item #2 estimate by the Corps. It has, therefore, been clearly proven that, through these adjustments alone, the Corps' bid item #2 estimate must be increased by $1,196,227 ($5,378,656 corrected bid item #2 estimate—$4,182,429). When bid items #1 and #2 increase as shown, mandated by the adjustment of *monthly cost* and *effective dredging days per month* added together, the following increments result in dredging costs:

| | |
|---|---|
| Bid Item #1 increase | — $ 666,332 |
| Bid Item #2 increase | — $1,196,227 |
| TOTAL INCREASE | $1,862,559. |

F.  Revisions in Monthly Cost and Dredging Time Analysis Produce An Awardable Contract

This increase we find produces an awardable contract well within the 33 U.S.C. § 624 limitations, *see* Appendix F:

| | |
|---|---|
| Corps' B & FE Adjusted By Court to Compensate for Mathematical Errors | $7,656,185 |
| Minimum Estimate Required to Produce an Awardable Contract | $8,996,800 |
| Minimum Required Increase to Produce an Awardable Contract | $1,340,615 |
| Proven Mandatory Increase | $1,862,559 |
| Proven Minimum Estimate (B & FE) plus Mandatory Increase | $9,518,744. |

As these aggregate corrections produce an awardable contract, it is unnecessary to carry our analysis further. We do, however, observe that other adjustments to the government's estimate would very likely be necessary if such were not the case. Thus, it is clear beyond cavil that the Corps did not prepare a fair and reasonable estimate in accordance with 33 U.S.C. § 624, ER 1110–2–1300, and EP 1110–1–8. Had it done so, it would have estimated the cost for the project in issue at no less than $9,518,744. That figure is within 25% of the lowest responsible, responsive bidder, plaintiffs here. Against this background, the Corps' failure to award the contract was a breach of its implied-in-fact obligation to treat all bids fully, fairly, and honestly.

G.  The Propriety of Permanent Injunctive Relief

In addition to succeeding on the merits, plaintiffs must satisfy the remaining requirements for a permanent injunction. As stated in *TRW Environmental Safety Systems, Inc. v. United States*, 18 Cl.Ct. 33, 72 (1989), before granting *permanent* injunctive relief in those cases where the plaintiff has proven the breach of the implied contract, we must also consider "(i) whether an injunction is within the public's interest; (ii) whether the plaintiff will suffer irreparable harm, including an inadequate remedy at law if the injunction is not granted; and (iii) the extent of injury to the defendant if the injunction is granted (or where the balance of hardships lies)." We find a permanent injunction to be in the public's interest in this case because to hold otherwise would permit the Corps to obtain the services of dredging contractors at depressed prices through the preparation of unreasonably low estimates, a scenario which 33 U.S.C. § 624, ER 1110–2–1300, and EP 1110–1–8 were clearly designed to prevent. As for the second element, the loss of an $11,246,000 dredging contract to which plaintiffs are plainly entitled undoubtedly constitutes irreparable harm; plaintiffs could only recover bid preparation costs in a suit for damages and, therefore, would have an inadequate remedy at law if the permanent injunction is not granted. Lastly, the relative harm to the defendant, if any, is slight, inasmuch as an award to plaintiffs would be at the *lowest* competitively bid price and would permit the dredging work to be completed expeditiously.

*Conclusion*

Consistent with the foregoing analysis, we conclude that the Corps has breached its implied obligation to treat all bids fully, fairly, and honestly. Furthermore, it is the finding of this court that the public interest is best served by the issuance of a permanent injunction, that plaintiffs will experience immediate and irreparable harm if the motion for a permanent injunction is denied, that plaintiffs have an inadequate remedy at law, and that the balance of hardships tips in favor of plaintiffs. Accordingly, plaintiffs' motion for a permanent injunction is HEREBY GRANTED, as follows:

The defendant, the Army Corps of Engineers, its officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with them on IFB No. DACW01–89–B–0076 are hereby PERMANENTLY ENJOINED from awarding a contract and disbursing funds under that contract to anyone other than the plaintiffs, the lowest bidder within 25% of the government estimate. The

Clerk shall enter judgment accordingly. No costs shall be awarded.

IT IS SO ORDERED.

## APPENDIX A

### Bid Item # 1 and # 2 Components Formula Definitions

*Bid Item # 1—Mobilization and Demobilization*

1. *Plant Mobilization Cost* = monthly dredge plant cost, DX 7, pp. 2, 4, × 1.13 bond and overhead, DX 7, pp. 2, 4, × 10 days of mobilization and demobilization, PX 7, p. 2, divided by 30.4 days/month × 70% usage, *see* DX 7, pp. 3, 5.

2. *Construction of Submerged Pipeline* = Pipeline construction plant cost + pipeline construction labor cost + pipeline purchase cost + pipeline construction supplies cost × 1.13 bond and overhead; *see* DX 7, p. 1; PX 7, pp. 32, 34.

3. *Pipeline Demobilization* = demobilization plant cost + demobilization labor cost + demobilization supplies cost × 1.13 bond and overhead; *see* DX 7, p. 1; PX 7, p. 33.

*TOTAL Mobilization and Demobilization Costs* for bid item # 1 are equal to the total of these three elements, *see* DX 7, p. 1.

*Bid Item # 2—Dredging*

1. *Mud Lakes Dredging Cost* = Mud Lakes estimated monthly cost, *see* DX 7, p. 2, × Mud Lakes estimated dredging time in months, *see* DX 7, p. 3.

2. *Gaillard Island Dredging Cost*— Gaillard Island estimated monthly cost, *see* DX 7, p. 4, × Gaillard Island estimated dredging time in months, *see* DX 7, p. 5.

*TOTAL Dredging Costs* for bid item # 2 are equal to the total of these two items. *See* DX 7, p. 1.

Monthly Cost = monthly dredge plant cost, *see* DX 7, pp. 2, 4 (which is plant ownership cost + plant operating cost + payroll cost, *see* DX 8) + costs peculiar to that portion of the project, *see* DX 7, pp. 2, 4 (which in this case includes at least booster cost + pipeline depreciation cost + 1.13 × the total of those costs for bond and overhead, *see* DX 7, pp. 2, 4).

Dredging Time in Months = (maximum estimated time to dredge channel in total hours divided by estimated effective dredging hours per day) divided by estimated effective working days per month. *See* DX 7, examples pp. 3, 5.

## APPENDIX B
### CORPS' BEST & FINAL ESTIMATE
ADJUSTED FOR MATHEMATICAL ERRORS

| | Best & Final Estimate DX 7, p. 1 | Changes | Best & Final Estimate Adjusted By Court To Compensate For Mathematical Errors |
|---|---|---|---|
| **Bid Item # 1** <br> MOBILIZATION AND DEMOBILIZATION | | | |
| Plant Mobilization | $ 139,875.42 | $ 4,544.42 | $ 135,331 |
| Construction of Submerged Pipeline | 2,849,862.00 | | 2,849,862 |
| Pipeline Demobilization | 257,767.00 | | 257,767 |
| Construction of Submerged Pipeline | 177,441.00 | 177,441.00 | — |
| Total | $3,424,945.42 | $181,985.42 | $3,242,960 |
| **Bid Item # 2** <br> DREDGING | | | |
| Mud Lakes | $ 692,469.75 | $ 19,583.75 | $ 672,886 |

|  | Best & Final Estimate DX 7, p. 1 | Changes | Best & Final Estimate Adjusted By Court To Compensate For Mathematical Errors |
|---|---|---|---|
| Gaillard Island | 3,574,536.00 | 64,993.00 | 3,509,543 |
| Total | $4,267,005.75 | $84,576.75 | $4,182,429 |
| Bid Item # 3 D/A PREPARATION | $ 84,036.00 |  | $ 84,036 |
| Bid Item # 4 D/A OPERATION MAINTENANCE | $ 146,760.00 |  | $ 146,760 |
| TOTAL ESTIMATE | $7,922,747.17 | $266,562.17 | $7,656,185 |

## APPENDIX C
### Monthly Dredge Plant Cost and Monthly Cost

|  |  | Best & Final Estimate DX 8, pp. 1, 2 |  | Best & Final Estimate Adjusted to Compensate for Mathematical Errors |
|---|---|---|---|---|
| Plant Ownership Cost |  | $ 64,371 |  | $ 64,371 |
| Total Operating Cost |  | $324,027 |  | $324,027 |
| Labor Cost |  |  |  |  |
| Management Payroll |  | $ 17,478 |  | $ 17,478 |
| Hourly Wages Per Week (64 hrs/wk at 4.34 wks/mo) | $ 83,236 |  | $ 83,236 |  |
| Taxes, ins., fringes | $ 31,338 |  | $ 31,338 |  |
|  | $132,052 | $132,052 | $114,574 | $114,574 |
| Monthly Dredge Plant Cost |  | $537,928 |  | $520,450 |

### MONTHLY COST

|  | Best & Final Estimate DXs 7 and 8 | Best & Final Estimate Adjusted To Compensate For Mathematical Errors |
|---|---|---|
| **Mud Lakes** |  |  |
| Monthly Dredge Plant Cost | $537,928 | $520,450 |
| Booster Cost | $110,000 | $110,000 |
| Pipeline Depreciation Cost | $ 46,225 | $ 46,225 |
|  | $694,153 | $676,675 |
| Overhead and Bond (13%) | $ 90,240 | $87,968 |
| Monthly Cost (Mud Lakes) | $784,392 | $764,643 |
| **Gaillard Island** |  |  |
| Monthly Dredge Plant Cost | $537,928 | $520,450 |
| Booster Cost | $330,000 | $330,000 |
| Pipeline Depreciation Cost | $ 87,855 | $ 87,855 |
|  | $955,783 | $938,305 |
| Overhead and Bond (13%) | $124,252 | $121,980 |
| Monthly Cost (Gaillard Island) | $1,080,035 | $1,060,285 |

# APPENDIX D
## Plant Ownership Cost
### Comparison

Corps' Corrected Best and Final
Estimate of Plant Ownership Cost
DX 8, p. 1

| | No. | Total Value $ | Depreciation Rate % | Depreciation Amount $ | Interest Rate % | Interest Amount $ | CFC Rate % | CFC Amount $ |
|---|---|---|---|---|---|---|---|---|
| Dredge | 1 | $6,000,000 | 3.00% | $180,000 | 5.23% | $313,575 | 4.18% | $250,860 |
| Tugs | 2 | 500,000 | 4.50% | 22,500 | 5.29% | 52,921 | 4.23% | 21,168 |
| Derrick Barge | 1 | 120,000 | 4.50% | 5,400 | 5.29% | 6,351 | 4.23% | 5,080 |
| Work Barge | 2 | 200,000 | 4.75% | 9,500 | 5.08% | 20,301 | 4.06% | 8,121 |
| Fuel/Water Barge | 1 | 110,000 | 4.75% | 5,225 | 5.08% | 5,583 | 4.06% | 4,466 |
| Yard Equip. (Misc.) | LS | 80,000 | 10.00% | 8,000 | 5.09% | 4,072 | 4.07% | 3,258 |
| Crew/Workboat | 1 | 75,000 | 4.50% | 3,375 | 5.29% | 3,969 | 4.23% | 3,175 |
| Skiff w/Motor | 2 | 16,000 | 7.92% | 1,267 | 5.22% | 1,672 | 4.18% | 669 |
| Totals | | | | A = $235,267 | | B = $408,444 | | C = $296,798 |

Bid Estimate A + B = $643,712 per year divided by 10 months/year = $64,371 per month

### Fair and Reasonable Plant Ownership Cost

| | No. | Total Value $ | Depreciation Rate % | Depreciation Amount $ | Interest Rate % | Interest Amount $ | CFC Rate % | CFC Amount $ |
|---|---|---|---|---|---|---|---|---|
| Dredge | 1 | $6,000,000 | 3.00% | $180,000 | 5.23% | $313,575 | 4.18% | $250,860 |
| Tugs | 2 | 500,000 | 4.50% | 45,000 | 5.29% | 52,921 | 4.23% | 42,336 |
| Derrick Barge | 1 | 120,000 | 4.50% | 5,400 | 5.29% | 6,351 | 4.23% | 5,080 |
| Work Barge | 2 | 200,000 | 4.75% | 19,000 | 5.08% | 20,301 | 4.06% | 16,240 |
| Fuel/Water Barge | 1 | 110,000 | 4.75% | 5,225 | 5.08% | 5,583 | 4.06% | 4,466 |
| Yard Equip. (Misc.) | 1 | 80,000 | 10.00% | 8,000 | 5.09% | 4,072 | 4.07% | 3,258 |
| Crew/Workboat | 1 | 75,000 | 9.50% | 7,125 | 5.29% | 3,969 | 4.23% | 3,175 |
| Skiff w/Motor | 2 | 16,000 | 7.92% | 2,534 | 5.22% | 1,672 | 4.18% | 1,338 |
| Totals | | | | A = $272,284 | | B = $408,444 | | C = $326,753 |

Bid Estimate A + B = $680,728 per year divided by 8 months/year = $85,091 per month

### Comparison of Monthly Dredging Costs

Corps' Corrected Best and Final Estimate of Monthly Dredge Plant Costs

| | | | | No. | Rate | Amount |
|---|---|---|---|---|---|---|
| I. | Plant Ownership Cost | | $ 64,371 | | | |
| II. | Plant Operating Cost | | | | | |
| | Fuel | $80,790 | | | | |
| | Water, Lube, Supplies | 30,000 | | | | |
| | Dredge Wear | 70,000 | | | | |
| | Repair & Drydock | 95,800 | | | | |
| | Yard Cost | 17,770 | | | | |
| | Insurance | 17,667 | | | | |
| | Lay Up | 12,000 | | | | |
| | Total Operating Cost | | $324,027 | | | |
| III. | Labor Cost | | | | | |
| A. | Management | | | | | |
| | Project Mgr. | | | | | |
| | Superintendent | | | 1 | Mo. | $4,000 |
| | Captain | | | 1 | Mo. | 3,500 |
| | Chief Engineer | | | 1 | Mo. | 3,000 |
| | Civil Engineer | | | 1 | Mo. | 2,500 |
| | Office Manager | | | | | |
| | Office Personnel | | | 1 | Mo. | 1,250 |
| | | | | | | $14,250 |
| | Taxes, Ins., Fringes | | | | .2265 | 3,228 |
| | Management Payroll | | | | | $17,478 |
| B. | Hourly Personnel | | | | | |
| | Levercan | | | 3 | $9.70 | $29.10 |
| | Watch Engr. | | | 3 | 8.63 | 25.89 |
| | Dredge Mates | | | 2 | 8.38 | 16.76 |
| | Tug Masters | | | 2 | 8.28 | 16.56 |
| | Tug Mates | | | 3 | 7.74 | 23.22 |
| | Maint. Engrs | | | 1 | 7.80 | 7.80 |
| | Equip. Oper. | | | 3 | 9.00 | 27.00 |
| | Welders | | | 2 | 8.51 | 17.02 |
| | Oilers | | | 3 | 6.23 | 18.69 |
| | Deckhands | | | 8 | 6.00 | 48.00 |
| | Electrician | | | 1 | 8.63 | 8.63 |
| | Gen. Dump Fore. | | | 1 | 9.00 | 9.00 |
| | Dump Fore. | | | 2 | 8.00 | 16.00 |
| | Yard & Shore Men | | | 6 | 6.00 | 36.00 |
| | Crew Total | | | 40 | | $299.67 per hour |

Fair And Reasonable Estimate of Monthly Dredge Plant Costs

| | | | | No. | Rate | Amount |
|---|---|---|---|---|---|---|
| I. | Plant Ownership Cost | | $ 85,091 | | | |
| II. | Plant Operating Cost | | | | | |
| | Fuel | $80,790 | | | | |
| | Water, Lube, Supplies | 30,000 | | | | |
| | Dredge Wear | 70,000 | | | | |
| | Repair & Drydock | 95,800 | | | | |
| | Yard Cost | 17,770 | | | | |
| | Insurance | 17,667 | | | | |
| | Lay Up | 12,000 | | | | |
| | Total Operating Cost | | $324,027 | | | |
| III. | Labor Cost | | | | | |
| A. | Management | | | | | |
| | Project Mgr. | | | | | |
| | Superintendent | | | 1 | Mo. | $4,000 |
| | Captain | | | 2 | Mo. | 7,000 |
| | Chief Engineer | | | 1 | Mo. | 3,000 |
| | Civil Engineer | | | 1 | Mo. | 5,000 |
| | Office Manager | | | 1 | Mo. | 2,400 |
| | Office Personnel | | | 1 | Mo. | 1,250 |
| | | | | | | $22,650 |
| | Taxes, Ins., Fringes | | | | .2265 | 5,130 |
| | Management Payroll | | | | | $27,780 |
| B. | Hourly Personnel | | | | | |
| | Levercan | | | 3 | $9.70 | $29.10 |
| | Watch Engr. | | | 3 | 8.63 | 25.89 |
| | Dredge Mates | | | 3 | 8.38 | 25.14 |
| | Tug Masters | | | 3 | 8.28 | 24.84 |
| | Tug Mates | | | 6 | 7.74 | 46.44 |
| | Maint. Engrs | | | 1 | 7.80 | 7.80 |
| | Equip. Oper. | | | 3 | 9.00 | 27.00 |
| | Welders | | | 2 | 8.51 | 17.02 |
| | Oilers | | | 3 | 6.23 | 18.69 |
| | Deckhands | | | 8 | 6.00 | 48.00 |
| | Electrician | | | 1 | 8.63 | 8.63 |
| | Gen. Dump Fore. | | | 1 | 9.00 | 9.00 |
| | Dump Fore. | | | 3 | 8.00 | 24.00 |
| | Yard & Shore Men | | | 6 | 6.00 | 36.00 |
| | Crew Total | | | 46 | | $347.55 per hour |

Corps' Corrected Best and
Final Estimate of Monthly
Dredge Plant Costs
    Hourly Wages Per Week
    (64 hrs/wk & 4.34 wks/mo)      $83,236
    Taxes, Ins., Fringes .3765      31,338

    Crew Payroll      $114,574
    Total Payroll Cost      $132,052

Total Monthly Dredge Plant Cost      $520,450

Fair And Reasonable
Estimate of Monthly
Dredge Plant Costs
    Hourly Wages Per Week
    (64 hrs/wk & 4.34 wks/mo)      $96,535
    Taxes, Ins., Fringes .3765      36,346

    Crew Payroll      $132,881
    Total Payroll Cost      $160,661

Total Monthly Dredge Plant Cost      $569,779

APPENDIX E

SUMMARY SCHEDULE OF THE FOUR GOVERNMENT ESTIMATES

| BID ITEM | (1) ORIGINAL ESTIMATE (PX 7, p. 2) | NOTES | (2) REVISED ESTIMATE CORRECTED BEFORE TRIAL BY THE CORPS (PX 7, p. 22) | NOTES | (3) REVISED ESTIMATE CORRECTED AT TRIAL BY THE CORPS (Warren, Tr. 480) | NOTES | (4) REST & FINAL ESTIMATE INTRODUCED DURING TRIAL BY THE CORPS (DX 7, p. 1) | NOTES |
|---|---|---|---|---|---|---|---|---|
| **1. MOBILIZATION & DEMOBILIZATION** | | | | | | | | |
| Plant Mobilization | $ 140,961.30 | PX7, p.7 | $ 140,961.00 | PX7, p.28 | $ 140,961.00 | PX7, p.28 | $ 139,875.42 | DX7, p.3 |
| Construction of submerged pipeline | 211,973.96 | PX7, p.13 | 2,849,862.00 | PX7, p.32 | 2,849,862.00 | PX7, p.32 | 2,849,862.00 | PX7, p.32 |
| Pipeline demobilization | 84,763.09 | PX7, p.17 | 257,767.00 | PX7, p.33 | 257,767.00 | PX7, p.33 | 257,767.00 | PX7, p.33 |
| Construction of submerged pipeline | --- | PX7, p.2 | 177,441.00 | PX7, p.34 ERRONEOUS ADDITION BY CORPS | 177,441.00 | PX7, p.34 CORRECTED AT TRIAL BY CORPS | 177,441.00 | PX7, p.34 & DX7, p.1 |
| | $ 437,698.35 | | $3,222,625.00 | | $3,426,031.00 | | $3,424,945.42 | |
| **2. DREDGING** | | | | | | | | |
| Mud Lakes | 697,916.69 | PX7, p.7 | 651,658.06 | PX7, p.28 | 651,658.06 | PX7, p.28 | 692,469.75 | |
| Gaillard Island | 4,694,085.50 | PX7, p.9 | 3,605,183.00 | PX7, p.30 | 3,605,183.00 | PX7, p.30 | 3,574,536.00 | |
| | $5,392,002.19 | PX7, p.2 | $4,256,841.06 | PX7, p.22 | $4,256,841.06 | PX7, p.22 | $4,267,005.75 | DX7, p.1 |
| **3. D/A PREPARATION** | 84,036.09 | PX7, p.11 & 14 | 84,036.00 | PX7, p.11 & 14 | 84,036.00 | PX7, p.11 & 14 | 84,036.00 | PX7, p.11 & 14 |
| **4. OPERATION & MAINTENANCE OF D/A** | 146,759.38 | PX7, p.16 | 146,760.00 | PX7, p.16 | 146,760.00 | PX7, p.16 | 146,760.00 | PX7, p.16 |
| TOTAL ESTIMATE | $6,060,496.01 | PX7, p.2 | $7,710,262.06 | CORRECTED BEFORE TRIAL BY CORPS | $7,913,668.06 | CORRECTED AT TRIAL BY CORPS | $7,922,747.17 | DX7, p.1 |

## APPENDIX F

| Bid Item | Best & Final Estimate Adjusted By The Court To Compensate For Mathematical Errors—Appendix B | Fair & Reasonable Estimate Adjusted For Monthly Cost Corrections And 26 Effective Days Per Month Of Dredging |
| --- | --- | --- |
| **Bid Item # 1** **MOBILIZATION &** **DEMOBILIZATION** | | |
| Plant Mobilization | $ 135,331 | $ 148,158 |
| Construction of Submerged Pipeline | 2,849,862 | 3,503,367 |
| Pipeline Demobilization | 257,767 | 257,767 |
| TOTAL | $3,242,960 | $3,909,292 |

($3,909,292 − $3,242,960 = $666,332 increase)

| Bid Item | | |
| --- | --- | --- |
| **Bid Item # 2** **DREDGING** | | |
| Mud Lakes | $ 672,886 | $848,968 |
| Gaillard Island | 3,509,543 | 4,529,688 |
| TOTAL | $4,182,429 | $5,378,656 |

($5,378,656 − $4,182,429 = $1,196,227 increase)

| Bid Item | | |
| --- | --- | --- |
| **Bid Item # 3** **D/A PREPARATION** | | |
| TOTAL | $ 84,036 | $ 84,036 |

| Bid Item | | |
| --- | --- | --- |
| **Bid Item # 4** **D/A OPERATION** **MAINTENANCE** | | |
| TOTAL | $ 146,760 | $ 146,760 |

| Bid Item | | |
| --- | --- | --- |
| **TOTAL ESTIMATE** | $7,656,185 | $9,518,744 |

a) Mandatory increase of $666,332 + $1,196,227 = $1,862,559.

b) Exceeds awardable contract level by $521,944
        ($9,518,744 − $8,996,800)